Good morning, Your Honors. May it please the Court. I'm Dan Maynard, and I represent the appellant, John Nassi. This case is here because the District Court granted a motion for summary judgment against Mr. Nassi. Judges, back in 1992, Mr. Nassi was a corporate officer at a subsidiary of the VAD Corporation. He was approached by the Chief Executive Officer, the Chairman of the Board, and the President of the VAD, and was asked, we're in toll, rather. We're going to sell off the subsidiary that you are a member of, but we want you to stay  And we will give you a contract that says that we're going to give you a pension for life when you reach 55, and Mr. Nassi at the time was 53, of $193,000 approximately, a little bit more. Additionally, in the event that you don't go to work for the new company, they don't hire you, we will hire you back for three years. You can either work for us at the salary you're getting now, with all the same benefits, or we'll pay you that salary for three years. I hate to interrupt so soon, but let me ask this question. So there's an issue about the standard that should be applied in this case, both at the trial court level and then, of course, on review. Is abuse of discretion the standard you would agree that would normally apply in terms of making the decision as to whether he's entitled to those benefits? I know you have a contrary argument based on the fact that you maintain there were procedural violations and structural conflicts of interest, and those we have to look at. But if you were to put those aside just for the moment, would it be an abuse of discretion standard that we would be applying? It's an abuse of discretion standard to apply to look at what the plan administrator did. Right, right. That's the standard that you would normally use unless there is something that heightens the scrutiny of that. Right. I believe this court has to look at what the district court did in granting a motion for summary judgment to Novo. And then my next question is, when you're reviewing or when a district court is reviewing what the administrator did to determine whether there was an abuse of discretion, what is the record that the district court reviews or should review, and what is the record the district court reviews here? Okay. We filed cross motions for summary judgment on this case. And we both presented the court with statement of facts that were supported by deposition testimony, documentary evidence, and things of that nature. What the record showed is that when Mr. Nassie made a claim for his pension in 2009, under ERISA law, VAD was supposed to do certain things to determine whether or not he was entitled to that pension. It's our contention that, first, VAD had a structural conflict because they were the ones who were administering the pension. They were going to have to pay it. So that's the first reason that you would add additional scrutiny. Secondly, we believe that VAD acted in bad faith in looking at this for a couple of reasons. And the evidence or the facts that show that they did... You made a bad faith argument in the trial court level? I believe we said that they... I'm not sure we ever used the term bad faith, but we certainly said that they didn't act reasonably. They blatantly disregarded the facts. And we pointed out exactly what they did. One of the things that they did was they're supposed to decide this within 90 days, and if they can't decide it within 90 days, they're supposed to give us written notice that they're going to need an additional 90 days. This case took close to a year for them to decide. And, in fact, when they gave a preliminary determination in the first part of October, that letter said that as soon as we get all of the documents that we're seeking, we'll render a decision within 10 days. There's a dispute as to whether or not my client was cooperating. We believe he did. We believe that VAD had asked him for certain documents from when he was working at MC22. They also sent a release for him to sign. He provided all the documents that they requested, and it wasn't until later that they said they needed more documents that he signed the release. It wasn't that he was refusing to sign the release. He never refused to sign it. Okay. I don't mean to keep jumping in, and I'll stop shortly. No, I prefer the questions. For the moment, let's go with abuse of discretion. We'll come back to the other if you want. But when you're reviewing a summary judgment motion based on a standard of abuse of discretion, it's a little bit different than a regular kind of summary judgment motion, isn't it? Because what you're looking at are the facts in the record and determining whether those facts that are put forth in support of the decision, whether the administrator has abuse of discretion. And so that has kind of another standard built right into the summary judgment context, which kind of throws that off, doesn't it? Well, I don't know that it throws it off, but it certainly, I will tell you, this continuum, and I spent a fair amount of time trying to understand the continuum between abuse of discretion and de novo and the decisions that have come out of this circuit, talking about the continuum and how you keep adding scrutiny depending on other things that you find, other factors, one factor being the structural conflict. Another factor is did they give a fair hearing? Now, I think in and of itself, if there wasn't a fair hearing given, you can find abuse of discretion. But I think if you think they gave somewhat of a fair hearing, it then moves you down closer to the line of de novo. And in this case, they didn't give a fair hearing. One, the timing was bad. Two, this was an investigation that was done not to determine what the intent of the parties in this case were. The administrator really was investigating trying to figure out a way not to have to pay this pension that was out there. And I would point the Court to a couple of things. One is Mr. Walling, who was the head of the pension plan at VAD for 20-odd years, said that he was the one that was the most knowledgeable about pensions. And back in 1993 and 1994, he was dealing with this pension for VAD at the time. Granted, he wasn't in the meeting where Nassie and Teets signed the agreement, but it was his job, when given a copy of the agreement, to implement it. He said, I created a file, I would have put it in there. He's the one that dealt with the outside actuarial firm, Hewitt, and said to them, and I believe it's January of 1993, after this first agreement is entered into, contacts them and they send him a letter saying, it's our understanding that Nassie will, okay, will, not contingent on anything, get a pension when he reaches the age of 55, and they talk about a secular trust and how much he would have to pay to gross it up to achieve that. You say the document was ambiguous, so you would agree. Would your argument be that the relevant document is ambiguous? I would say that there's ambiguity in the document, absolutely. When it's ambiguous, wouldn't the administrator have discretion to determine its meaning? That's what they're supposed to do, yes. All right. But they have to exercise it properly, and they didn't in this case. You would have thought that the administrator would have called Mr. Walling and asked him about the document. What did you mean when you wrote it? His testimony was that I got a call from the general counsel, Mr. Sayre, who sat on the committee that made the decision for the plan. He never asked me about my memo. He never asked me about the document. He never asked me about my conversations with Mr. Nassie. What he did was, and what the counsel for VAD did, was they contacted Walling, and what they were trying to do was figure out a way to show that he was incredible. They didn't ask what his opinions were. They didn't want to know what his opinions were. They saw the document that supported my client's position, and all they wanted to do was, how can we get around that? And then what happens is when Sayre has turned this investigation over to another attorney, to Polly, and she asked him, have you talked to Walling? Yeah, I talked to him. He doesn't know anything. Well, that wasn't true. That was disingenuous. That was misleading. Additionally, when Ingersoll, the other member of the panel, asked Sayre, you know, did you talk to Walling? What is Walling? Oh, Walling doesn't know anything. He doesn't know anything about these documents. It wasn't true. I mean, it just wasn't true. For whatever reason, Mr. Sayre attempted or seems to have been trying to mislead everybody in this. That in and of itself is an abuse of discretion. Counsel, can I shift you to a different topic? I know it's not the ground that the district court relied on, but I'd like to hear your response to the argument that actually your client had been overpaid, right, by virtue of the August 1995 payment to the secular trust, that that tax payment that was made on his behalf should have been deducted for all of those years and that if you grossed up all of the money that he was overpaid, given his life expectancy, he'd never be able to essentially repay that back. And so, in essence, he's received more than the benefit of the bargain he struck back in 1993. I understand that seems to be what they argued. That was an alternative argument that seems to be made, even though the district court didn't deal with that. But, Your Honor, if you looked at the excerpts of record at ER 61, this is a memo from July 5th of 1995, and this is coming from the outside consultants, the consultants that were always used. In looking at a secular trust, if that's how you're going to try to satisfy a pension obligation, they said that the tax equalization was needed. Non-qualified pension plans do not have the same tax advantages as qualified plans. This is what was done all the time. And if you look at the memo from January of 1994 that was written back to Mr. Walling, they talk about doing a secular trust. And in that memo, and I believe it's ER 14 or 15, in that memo, again, they talk about doing a gross-up. This was something that was just routine. If you were going to, instead of paying the monthly amounts or the annual amounts, if you were going to give them a lump sum because of tax implications, they routinely did this. Okay, yeah, that's fine. But I haven't heard you respond to the argument that I think your opponent is going to make, that, in fact, that payment to the IRS was essentially your client's money. It should have been deducted from the monthly amount he was getting, you know, for all of those years, what, 13? I can't remember exactly how many. Thirteen years. Thirteen years, right? Right. Yeah, so are you disputing that or? Yes, absolutely. On what grounds? On the grounds that what he was getting was a pension of $193,000 a year. The question was how was he going to be paid it? If he had, he retires at 55. When they were looking at doing the secular trust for him, I mean, they could have, that's one way that Dial satisfied their obligation. Well, and he wanted that, right? It had big advantages for him. Right, so a big chunk of that $193,000 per year, right, that he was supposed to get. He said, you know what, I don't want to take a chance that you guys will still be around all these years later. Pay me my money now into the secular trust, right? Yes. And that entire amount, both the amount he received and the amount paid to the IRS, should have thereafter been deducted from the gross, right? Oh, absolutely. I'm sorry. I misunderstood you. Absolutely, the amount that was paid to him as part of the secular trust should have been deducted, and it was. And was not. The tax payment portion, that's what I'm talking about. The tax payment portion. It was not deducted, and it should have been, right? No, it was. It was because of the way that they handled all of their secular trust in their pension plans. I mean, if he had chosen to take a complete secular trust from the date of when he was going to retire at 55, he would have gotten approximately twice as much. The secular trust was based on him retiring at 65. Either way, there would have been a tax gross-up. The tax gross-up is just a component of the secular trust. Yes, it results in a tax benefit to some degree, but it's never considered that it's additional payment on top of the pension that he's getting. I guess I just don't follow that. I mean, there is a portion that was being deducted, right? It's in the neighborhood of $5,000. Yes. Right. Okay. And you say that should have been deducted. Absolutely. So why shouldn't the tax payment portion, in addition, have been deducted? Because it was for his benefit. He would otherwise have had to pay taxes on that money. It was for his benefit, but it was when you're paying off a pension obligation, when a company is going to satisfy the pension obligation and they're going to do it either by paying it over the lifetime of the person or they're going to give him a secular trust, which is a lump sum amount, there is always a gross-up. It's just automatic. It's just the way they do it. They always do it that way. I don't know what else. I guess I'm not understanding why that means the money shouldn't have been deducted from the monthly payment he was receiving. Is there a way you can just crystallize your case? I don't know how to crystallize it other than that. I mean, if he wasn't going to get the benefit, then you would never take a secular trust because there's different tax implications that would occur by taking all that money at one time. I mean, obviously, he gets $600,000, and then the gross-up is $550,000. I mean, that's not the kind of taxes he's going to have to pay if he had taken it out over his lifetime. Okay, counsel, if I could interject a less refined question, sort of basic ERISA question for me. To the extent that contract law is pertinent to whether appellant wins or appellee wins, do we look at a particular state's contract law, or do we look at some federal contract law because of ERISA? No, you look at a state's contract law. You would look at Arizona's law where the contract was entered into, and I would direct the court to the Taylor case, which I've cited in my brief. Thank you. I see my time is up. We'll give you time for a rebuttal. Okay. Thank you, counsel. We'll hear from counsel for VIAD. Good morning, Your Honors. My name is Lou Clark. I'm with Squire Patent Laws on behalf of VIAD and the VIAD plan. Thank you for your time this morning. The district court in this case properly granted VIAD's motion for summary judgment. It properly denied Mr. Nassi's motion for summary judgment, and we request that this court affirm that decision. The district court did apply the proper standard of review, which is abuse of discretion, and it applied that standard of review correctly because the plan itself that is at issue vested VIAD as the plan administrator with the authority to make the determination that's at issue today. So inherently, abuse of discretion is the standard, and so as a result of that, and the parties really don't dispute that VIAD as the plan administrator had the authority to make the decision, and then at bottom, the abuse of discretion standard is the applicable standard here. And so what that means is the district court's task, and this court's task, is to determine whether or not VIAD acted logically, whether its determination was plausible, and whether it's reasonable based upon the inferences that can be drawn from the facts in the record. And Judge Oliver, you asked what is the record in this case, and the record in this case really is the collection of documents that the administrator prepared in determining the claim in the first place. And so really what we have are two big collections of documents. First is in October 2009 is when the plan administrator issued a preliminary determination, and that was, again, May of 2009 was when the issue came before VIAD. October 2009, a preliminary determination is made really where all the issues that we're talking about here today were addressed preliminarily. And also VIAD asked Mr. Nasti through his counsel to provide additional information, which was then provided later. And then finally, there's a final determination made in May of 2010 right before this case was filed, and those documents that are attached to those determinations really constitute the administrative record in this case, and that is really what is attached to VIAD's motion for summary judgment and what was really addressed by the parties. There was other discovery in this case. How does that fit in to a review of administrative record? That's what I want to know. Well, and that's a fair question. Really the discovery that was conducted in this case really centered around the documents and the information that was compiled when those two determinations were made. And one point, and I'm going to come to your question a little bit indirectly, and that is the difference between an abuse of discretion standard and the de novo standard. Really the main difference is that in a de novo standard, the court can work outside the administrative record and can look at those sorts of things. Now, I will say that all of the evidence that was submitted by the parties in support of their respective motions for summary judgment all supported the fact that VIAD, as the plan administrator, acted completely within its discretion to make a very logical and plausible determination that he did based upon the underlying document, which would be the May 1993 letter. And so this court's job at this point is to review the district court's decision to determine whether or not it was plausible, logical, and could be drawn from the record. Now, interestingly, the district court in this case went a step further and it did review the plan administrator's determination applying a de novo standard and still found that VIAD not only had made an appropriate standard, had acted within its discretion, but made the correct determination. The district court judge believed that this was the right outcome and the correct interpretation of the underlying document that is at issue. Okay. Now, but that's – if we're not doing abuse of discretion, which gives, of course, gives the administrator quite a bit of leeway when they're conflicting possibilities even, and you go to de novo so you don't have that same standard, it means that the court is looking at it fresh and making a determination as to what the contract or what the document means, right? That is true, Judge. So the district court would be able to, again, look outside the administrative record and make the determination de novo. But what does that mean in regard to things like material issues of fact and so forth? Do they become – does that standard play a little different role in the de novo context than it would in abuse of discretion? I don't believe that it does. I still think that the case law supports the proposition that in the ERISA context, even in de novo standard, that the summary judgment mechanism still is unique with respect to ERISA as far as genuine issues of material fact are concerned. Of course, this issue was not raised as to what is the proper motion for summary judgment standard because I think the parties were, particularly at the trial court level, in agreement on the abuse of discretion standard. Now, I would like to address some of the procedural, what have been characterized as irregularities that Mr. Maynard has mentioned and some of the things that have been mentioned in the brief. And one of the things that Mr. Maynard mentioned was that it appeared as though Mr. Sayre or members of the Compensation Advisory Committee, which was the body within DIOD that made the determination, was trying to figure out how to get out of paying for this claim or paying this benefit. Now, there really isn't any evidence in the record to support that. The truth is that when this issue came before DIOD in May of 2009, Mr. Nassi had been employed for 16 years with another entity not within the DIOD family of companies. So Mr. Nassi was the CEO of TMO, which was one of the subsidiaries of DIOD. And when MCII was spun off as its own public company, Mr. Nassi became employed by an entity whose parent was that entity, MCII. And from that point on, from August of 1993 until May of 2009, there were no dealings between Mr. Nassi as employee of TMO and DIOD. And so when this issue came before Mr. Sayre and the others within the company, this was a completely foreign subject to them, and they received a terse two-page letter from Mr. Nassi's counsel in May of 2009 saying, you owe him $193,000 a year and a bunch of back pay or back pension pay up in 10 days. And so what are they to do? They're supposed to figure out whether or not they actually owe this. They're certainly not, and their role within the company is supposed to take Mr. Nassi or his counsel's word for it and simply say, well, I read the letter. It looks like you're right. Here, we'll get this underway. No, they did what ERISA requires them to do, which is they started to investigate to determine whether or not Mr. Nassi's contentions were correct. And out of the box, right out of the box, they found out he was wrong. In the first letter that his lawyer sent, he demanded over $15,000 a month under the supplemental pension plan because he contended that that was what he had been receiving under the MCII plan. That was untrue. He was receiving $8,200 a month. He asked for almost double what he was actually receiving from MCII, from VIA. And to this day, to this day, we still have no explanation as to why Mr. Nassi and his lawyers came to VIA asking for $15,000 a month when he had only been receiving $8,200 a month. So right out of the chute, VIA had to determine whether or not this claim had validity. And that first foray into this caused VIA appropriately to be skeptical and to make sure that this was going to be a thorough analysis. And so throughout the summer and fall of 2009, there was information exchanged, requests for information from Mr. Nassi. He was asked for, in August of 2009, for a release so that VIA could go to MCII and get the employment records from MCII that it had had for the last 16 years that VIA had no control over at all. MCII was right to ask VIA for a release from Mr. Nassi in order to do that. And it wasn't until November of 2009, after the October preliminary determination, that Mr. Nassi actually provided the release. And then it wasn't until December of 2009 that VIA actually got, for the first time, the collection of personnel records from MCII, seven months after this all started, largely due to Mr. Nassi's lack of forthrightness, lack of candor. And so what was very interesting, too, was that it was in December of 2009 when MCII provided the documents that VIA had learned for the first time that not only did Mr. Nassi receive the secular trust payment of close to $600,000 in 1995, but that's when VIA learned that he received the tax gross-up as well, the half-a-million-dollar tax gross-up. And certainly that took VIA by surprise as well because, again, it hadn't been mentioned anywhere. And so it completely took them by surprise. And so, you know, again, VIA knowing this and knowing that it's getting information that it didn't realize, which impacts its analysis, needed to be sure that it was making the correct decision. Let me ask. Sure. I don't mean to – I understand your – I read your brief and I understand your arguments on that, and it is an important argument, but let me just ask a couple of quick questions. I just want to clarify. I understand your argument was he was not entitled to a pension because the condition precedent was not met. Right. But also clarify, when MCII – I mean MCII did agree to provide him benefits of $102,000, pension benefits of $102,000 for life when they decided to adopt some of the terms that arguably were in the VIA's agreement. Is that right? Yes. So sequentially what happened was Mr. Nassi and VIA entered into the agreement in May of 1993, and then in August of 1993 is when the spinoff occurred. Right. So leading up to that, VIA and TMO and MCII, these subsidiaries that were going to be spun off, entered into the employee benefits agreement. And under the employee benefits agreement, the spun off entities would then take on those pension obligations. And they took on an obligation of $192,000. Right. The number that was in the VIA's agreement. That's right. Although you – but your argument is that conditions were different. Right. So again, I'll come back around. So when VIA and MCII entered into the employee benefits agreement, VIA was doing what it intended to do, which was take Mr. Nassi and other executives and make sure that they had the same supplemental pension benefits with the spun off entity as they had with VIA. And so that's why when MCII established its plan and in the schedule to that plan, Mr. Nassi is mentioned by name and it's mentioned that the amount is per the 1993 letter agreement. And so VIA placed him in the same position he would have been had he continued to work for VIA because it had to do that because he would have no longer been employed by a company that was in the VIA control group for ERISA purposes. But so it wouldn't – MCII, in your view, did not take on an obligation which VIA had to pay that pension. No, it did. But it placed him – But there was no obligation, I think you said VIA had. So VIA's obligation and what comes back to your question earlier about the gross up had to do with the benefits that had accrued up until the time of the spin off. MCII took on the obligation going forward from August of 1993 onward. And then the condition precedent that didn't trigger VIA's obligation to take on that obligation was the fact that he continued to work for two years after that. So in other words, because TMO or MCII did not terminate his employment within those two years, it didn't trigger VIA's obligation under that paragraph of the agreement. Right. That's our position. Right. But even – And that's what the administrator concluded and that's what the district court upheld. But if the administrator had concluded that there was an independent obligation, then you would be still required to pay it despite the fact that MCII had paid money until bankruptcy. Right. And so here's what's really interesting about this case. If you take Mr. Nassie's contention to its logical or illogical conclusion, that that sentence in that agreement is truly an independent obligation, the only statement in that sentence is that he has to survive to the age of 55. So in other words, if Mr. Nassie and VIA had plucked that sentence out of this agreement and placed it in another document on VIA's letterhead and the two of them had signed that, what would that mean? That would mean that as soon as he turned 55, regardless of what MCII has done with respect to his pension, he could come to VIA. Regardless of whether or not he had worked there for two years, frankly, he could have walked out the door that day having signed that agreement and said, I'm going home. And when I turn 55, I'm going to come back and you're going to pay me $193,000 a year. That is illogical. That is implausible. And that is unreasonable. Now, that's why VIA, as the plan administrator, determined that this necessarily, this two-year contingency applied to the pension benefit, and that's why the district court upheld the determination. And that's why we would have this court to affirm. Counsel, if I could just confirm on a theory point here. To the extent that contract law is pertinent to whether the administrator properly assessed this, what you claim is a condition in the agreement, is that a question of Arizona law, as your friend said on the other side, or is there some common law of contract under ERISA that we have to look at? Your Honor, I have to confess I'm not as learned on this perhaps as Mr. Maynard is, but my view of it is that under ERISA, federal common law applies to the interpretation of contracts that relate to plan determinations, but that under federal common law, the court would apply the law of the jurisdiction in which the contract was written. I believe that that's the case, and I'm not sure that, I don't think we addressed that in our brief, and I don't think that Mr. Maynard did as well. Either way, you agree that Arizona contract law governs. I would agree, yes, Your Honor. Okay. Yes, Your Honor. Great, thank you. Thank you, Your Honors. Okay. Thank you. Let's give Counsel Patel three minutes for rebuttal. Thank you, Your Honor. I appreciate it. To address the issue that you and I spent some time on, I would ask the Court to look at ER60 and 61, which is the July 5, 1995 letter that I made reference to earlier from Hewitt, and it specifically deals with the issue of tax equalization and says that because non-qualified pension benefits do not have the same tax advantages as qualified plans, tax equalization is needed. The intent of tax equalization is to keep the executive whole in terms of after-tax retirement income. That's all I can tell you on the issue. My understanding is it is always done in a secular trust situation. Your Honor, to Judge Oliver, to answer your question about the record, the record before the district court and before you is somewhat different than the record that was in front of the plan administrator for these reasons. There were things that the plan administrator should have considered that they did not, that was in the record with the district court and with you. Those things would include the nasty letter that he sent to Ms. Pearl, who was on the committee on June 24th. When counsel said that they didn't know anything about this tax gross-up until November or late November or December of 2009, I beg to differ. Mr. Nassie, Ms. Pearl calls him. He sends her a letter on June 24th of 2009 explaining that he got the tax payment. He got the secular trust. He attached documents that if you read the documents would indicate that there was a tax gross-up there. He wasn't trying to hide it. He actually encouraged her and asked her to go to Hewitt, which was the outside consultant that had always been used to figure out what he was really owed. And he did this within 30 days after he filed his initial letter. What happened to that letter? Well, Ms. Ingersoll never saw it. Ms. DiPaoli tells us that she didn't even think it existed when I deposed her, and yet we found in discovery that Hewitt got a copy of it. And Ms. Pearl said, yeah, I received it, and I either gave it to Ms. DiPaoli or I probably sent it to Hewitt or I may have given it to my secretary. Never got it in discovery, and it never was considered by VIAD when they made this determination. Additionally, when VIAD, when they planned, when Ingersoll, one of only two members of the plan, made the determination, she didn't know anything about what Mr. Walling had said and why he had said it. In fact, her understanding was he had no knowledge whatsoever. Lastly, Ms. Pearl testified, as did I think Ms. DiPaoli, that they routinely kept minutes of all their meetings. Conveniently, we have no minutes of any of the meetings that were held by this plan committee to make this determination. That in and of itself should cause skepticism by anybody reviewing that decision-making process. And I see that my time is up. Or no, I still have some more time. No, you're counting up because you exceeded it. But the case just started. You will stand submitted. Thank you, counsel, for your helpful arguments on both sides. We appreciate it. We will move to the last case on the calendar, which is Alves v. Emerald Correctional Management, LLC. Thank you. May it please this panel, counsel for the defendant, in light of the hour, I would suggest that maybe we could just send this case back to the district court and let me make the arguments about the inferences that should be drawn from the facts there, where they should have been made in the first place. This case, Ms. Alves' case, was not something that reared its ugly head out of the waters. It is something that grew in a swamp of sexual harassment. Your whole case, though, your argument here turns, I think, on the fact that whether the investigation in this case was done in bad faith. You make that argument. Whether you call it bad faith or whatever it was, the investigation was flawed in some fatal way. And I think it's important that, since that's your argument, that you clearly address that issue and then give us some citations or something to support factually why that's the case so we can have that clearly in mind. I'd be happy to do so, Your Honor. We start out with the fact, which I believe is uncontested but would be at trial, that when Ms. Alves began working at this place, she was required to sign a waiver of her rights under Title VII. That starts off with a big negative on the company's side. And that document is not in her file now. So the fact that my client's recollection was there and it's not there now indicates bad faith right there and a cover-up on their part in doing that. So we start there. And I really think that the important question is, at what level does good faith constitute a defense? I don't mean to guide me where you want me to go, take too much of your time. But if I'm correct, your argument is that the investigation regarding the appellant in this case that led to her firing was done in bad faith. And therefore, their arguments about why they got rid of her were pretextual. I think that's your argument. Well, I think that she has two causes of action. One of them is determination. The other one is retaliation. Certainly. But on the retaliation thing, her supervisor joined the conspiracy against her. And I think the principal point in there is that my client never knew that she was under investigation for sexual harassment until she was fired. And how can you conduct a good investigation? Your arguments are a little less than that, but that's kind of the point I want you to address. I didn't know that you made the argument that she didn't even know she was under investigation. I thought your argument was that she didn't know all of the allegations which were made against her, some of which led to her being fired. You know, when she first went in, she was placed on administrative leave. Their first reaction was not to put her on administrative leave but to change her to the worst possible shift that they could. And so she knew that what she thought was the investigation of her charges was not going well and was not going to be handled as she would like it to be, and so she sought counsel. But when they interviewed her, their interview of her, as I would present it, was they asked her a couple of trick questions. You know, did you ever put your hips up against the guy? And they used that to corroborate the fact that when she was trapped in her workplace by the man who a few days before had assaulted her by groping her breasts and her groin and kissing her, and she got up and she brushed by him, their investigation interpreted that as saying, well, I admit that I did rub myself up against him. And she was thinking that they were talking about, well, on one of the holidays out in the parking lot, this guy went around kissing the different women and she got kissed. So she was not even aware that she was responding to that, and she was not allowed to respond to the investigation. She didn't know that that was an accusation against her. And if you don't let her know what she's talking about, how can it be a good faith investigation? How can she respond to it? And her supervisor was creating a false record. They had records in there, their time records. Their corroborating evidence was made that this person reported to a supervisor that this was going on. Well, their time records show that that supervisor wasn't even working on the day that that happened. So you need to at least look at what it is. And she could have been very helpful to them, and she will be very helpful to the jury if she gets a chance in explaining where this went. Judge Gould, if I could ask you a question, please. Was the argument presented to the district court that the company's investigation was not made in good faith? That question was raised in the brief, and I have cited in my brief chapter and verse, page and line, where it was made. And it was not made perhaps as fully at the trial court as it was on appeal, but I think that I can argue against the judge's decision on appeal, whereas at the trial court I would be arguing against the other side's position. But if I recall correctly, that was kind of something that the trial court came up with, not the other side. I'm not sure about that. But I believe that the issues were decided, the issues were raised, and that the court is not authorized to grant summary judgment when a reasonable jury could have found otherwise. And the evidence is in the record of all these facts, and it was incumbent upon the court to consider the facts. There wasn't a big record. It was just the motion on summary judgment. Okay, thank you. I'm sure that to some extent bad faith is going to be pertinent on your pretext issue, but I just was curious if it was presented the same way to the district court. I think I did a better job on appeal than I did at the district court, and I hope I'll do a better job at jury trial. Are you going to address your separate claim of the hostile work environment claim? Yes. One of their complaints is that she didn't complain about this, but the situation was so toxic that it had gone well beyond something that they should have known about. You know, when you go into work there, you're greeted with a what's up, homo, and when you complain about it to the supervisor, they say that's the way it is in prison. It's a tough situation. Just ignore them. And I'm talking not about things that just my client witnessed, but my client and other persons witnessed. They see people, they see an EMT going around the workplace simulating masturbation and throwing imaginary semen around the workplace. They see him pulling up his shirt and rubbing his nipples. They overhear their supervisors boasting at length about their sexual relations they had with coworkers. They see an officer sitting on a chair rocking back and forth saying this is how you have sexual relations with them and how you stimulate them to the point of screaming. You hear people talking about whatever Rusty Sanchez is, but somebody ends up with a mustache made out of either vaginal blood or fecal matter, and that's what everybody was seeing, not just my client. And you're saying that it was so pervasive and so open within the workplace that folks at the supervisorial level knew or I guess should have known about it. And were participating in it. You know, the reason that she didn't immediately report the assault by Urias is because her supervisor was galleying with another female employee at the time. The reason that she didn't make an earlier written complaint about Urias was she was sitting down writing the complaint when he came in and assaulted her and groped her body. And everybody testified, everybody testified that they were afraid to report it and that they didn't think it would do any good and that's why they didn't. And it turned out that everybody that complained about it got disciplined, every single one of them. In the Haas environment claim, there's a question as to whether Farragut v. C of Boca Raton applies or whether another standard applies. And you would argue that the Farragut standard doesn't apply in regard to co-worker harassment, would you? You've understood me perfectly. If there are no further questions, I'll save my time for rebuttal. Okay. That's a good idea. And we'll hear from counsel for Emerald. Yes. Good afternoon, Your Honors. My name is Chia Balch with Fisher and Phillips on behalf of the defendant in this case, Emerald Correctional Management. Yes. Your Honors, the main arguments here on appeal, as you pointed out, essentially are that the appellant is raising that Emerald conducted a bad faith investigation that was essentially rigged to reach a predetermined result, in essence, what his claim is, and also that Ms. Els was somehow relieved from her obligation to report alleged harassment to Emerald because Emerald somehow had actual or constructive knowledge. I mean, I don't know what you're going to address first, but on the hostile work environment claim, this sounds like an incredibly toxic work environment to me. I can't imagine there are many people who'd want to have to go to work in that place every day, given what we've heard went on. The specific issues of whether or not that conduct actually occurred is disputed. However, I don't think that has – I don't think that creates an issue of material fact before this court due to the further alleged offense that the district court relied upon. You think the judge applied the law correctly on that? I do think that the judge applied the law correctly on that. So, first of all, I wanted to start off with my lead argument that these issues that Elvis's attorney is now raising on appeal were not properly brought to the attention of the trial court. They were not properly briefed or presented to the trial court, and they are therefore not properly on appeal here before this court. Tellingly, when I briefed this issue fully in Emerald's response memorandum, opposing counsel cited, as he just referenced a few minutes ago, to line and verse of where he allegedly raised these issues to lower court. However, upon a further review of the specific summary judgment briefing, Elvis never actually argued that Emerald conducted a rigged or bad faith investigation. Rather, Elvis speculated that perhaps, for example, one of the lines and verses that opposing counsel cites to is that perhaps Emerald only fires females for alleged misconduct. That is in support of the contention that Emerald conducted a rigged result. However, the undisputed facts actually show the complete opposite. The undisputed facts show that Emerald terminated both Elvis and her male counterpart, who she cross-complained to throughout, who was male. Though he didn't use the words bad faith below, didn't he really challenge the process that was used for making determinations whether she be terminated? I do not believe so, Your Honor. I believe that what opposing counsel was challenging was the ultimate results of the investigation, not alleging that there was bad faith or something improper with the actual process of the investigation. As the district court judge pointed out in his motion for summary judgment, I want to cite to a passage here. Here, although plaintiff disputes the accuracy of the allegations against her, she did not dispute that Urias reported that she repeatedly rubbed up against him and forcibly kissed him while rubbing against his groin. She did not dispute that Ross reported that she personally witnessed grabbing Ochoa and making sexual comments about him. She did not dispute that Ocosta reported witnessing her rub up against Urias by the water cooler. Plaintiff does not dispute that more than 15 people were interviewed during defendant's allegations, in the allegations of sexual harassment made against her. All those witnesses corroborated the cross-complaint of Alves' male counterparts against Alves. And although plaintiff now argues that she did not mean to imply that she initiated or welcomed the kiss with Urias, she testified that she told defendant that the kiss was mutual. So, in essence, Alves is not arguing, or she did not argue before the trial court, that there was something wrong with the investigation. She is saying that Emerald misinterpreted what she was saying, or she didn't really mean what she told Emerald during the investigation. Does she make an argument at the trial court level that there were witnesses that she had or identified that they did not interview? Does she make that argument? No, Your Honor. Your Honor, I respectfully submit that Emerald was entitled to take Ms. Alves at her word when they conducted the internal investigation. And that's what they did. During the investigation, Ms. Alves admitted to engaging in very egregious misconduct. And it's important to note that Ms. Alves was actually a supervisor. She was the one who – I'm sorry, just back up. She admitted engaging in egregious misconduct? You're not talking about the mutual kiss, are you? What did she admit having done that was so egregious? She admitted to engaging in rubbing up against Urias. She admitted rubbing up against Urias. She admitted to engaging in what she considered to be a mutual kiss with a subordinate employee When Urias said that it was not mutual and other witnesses corroborated that, when Alves and Urias walked out of a room, he was pale white. Are you saying Urias was a supervisee of Ms. Alves? Yes, he reported to Ms. Alves. Okay. And he was in his early 20s, and Ms. Alves was in her 30s or 40s. Same thing with Mr. Ochoa, very young employee in his early 20s. I thought Ochoa – I knew Ochoa was the supervisee. I thought Urias was more on the level of a coworker. He was subordinate to her, not within her specific department. He was an officer, but he was subordinate to Ms. Alves. Ms. Alves was a supervisor. Was his supervisor – you're just saying that they reported up different chains, but she happened to be a rank above him? That would be correct, Your Honor. Mr. Ochoa was directly within Ms. Alves' department. Counsel, if you're looking to see what to go do next, I'd still like to hear a little bit more on the hostile work environment claim. It seems to me that perhaps a reasonable jury could look at – let's put aside the conduct with Urias, which, I mean, I think if supervisors at your client knew about that, I think most people would agree that puts the case in a whole different light. But assuming that they didn't know about that, she never reported that other than the mutual kiss, what about all the other sexually charged conduct that seems to just pervade the workplace that she was aware of, that at least plaintiff's counsel says supervisors participated in, certainly had to have been aware of? Why couldn't a reasonable jury say, you know, just based on that, she was experiencing a hostile work environment? Because that was never actually argued. Back up. There was no evidence that was submitted in support of that at the trial court level, although opposing counsel in a summary judgment briefing made allegations such as personnel knew of these allegations. If you actually look at the cited record, the statement of facts that are cited refer to just the generalized allegations that – of what conduct occurred between Alves, Ochoa, Acosta, and Urias. So essentially she is saying since Alves, Acosta, Urias, and Ochoa were all aware, therefore it was so pervasive. She's never actually alleged that any supervisors personally witnessed any of the behavior between her and her alleged harassers. Quite to the contrary, Alves actually alleged that much of that occurred in private. No, I know. That's why I said let's put that aside. Okay. But I'm talking about all the other stuff. All the other stuff. There were, I mean, just, you know, there were a lot of comments made of a sexual nature. There was joking, teasing. I'm just talking about all the other stuff that didn't involve her directly being groped or assaulted in some cases by a particular employee. Just the general workplace environment. Why wasn't that pervasive enough, in the open enough, where surely supervisors at the company had to know that that was the nature of what was being tolerated? Because that was, first of all, inadmissible hearsay. She did not provide any actual evidence that, any admissible evidence that that actually did occur in the workplace. Those were all conclusory statements that were made by Alves. She did not provide, for example, testimony of any employees who allegedly suffered this behavior. She wouldn't even have to, actually, if she testified to what she knew. As long as she was a recipient witness, that would be enough, wouldn't it? I don't believe that she was a witness to most cases. She was, I mean, these two were discussing various sexual activities they had engaged in, and at one point I think she said, hey, you know what? I find that highly offensive. I don't want to hear that. I mean, that's just one example I can think of off the top of my head, where she was actually there and heard these people. It didn't involve her, but these people were just talking about what they were doing. Those allegations are in reference to non-supervisory employees, though. Those are coworkers of hers. She has never alleged that that was actually witnessed by her. Counsel, Judge Gould, could I ask you, just to clarify this, am I understanding you correctly, that although the brief said supervisors knew of this, you're saying that none of the evidence submitted in affidavits or testimony, no admissible evidence showed that a supervisor knew of this? Absolutely, and thank you for putting that much more succinctly than I was doing. That is what I'm saying, Your Honor. So, in essence, with respect to the retaliation claim, faced with Emerald's prompt and comprehensive investigation to her allegations, I'll be simply arguing that there was some type of a biased investigation, but there is no evidence actually supporting the fact that the investigation was biased. It was not fully briefed or factually developed before the trial court. And, frankly, with the level of corroboration with the 15 different fact witnesses that Emerald had during its investigation, it really had no other choice but to reach the conclusion that it did, that ALDS had engaged in misconduct that was terminable under its sexual harassment policy. So, therefore, her termination from Emerald was completely proper. It was not retaliatory. Rather, it was due to her own admissions of engaging in misconduct with subordinate employees. With respect to the harassment claim, the district court correctly held that ALDS claims failed as a matter of law. Did she make the argument at trial that she didn't really know all the charges against her, that when she was then interviewed, they only asked her about certain things and not others? And did she then tie that to the administrative record to support what it says in regard to what she had been asked? She did not. And, quite to the contrary, Emerald produced evidence that during a September 14th interview with Ms. ALDS, they actually questioned her about Urias and Ochoa's allegations, and that is when Ms. ALDS did, in fact, admit to engaging in some misconduct. She's saying on appeal that the conduct which she admitted to was only part of what she was charged with, and that the problem was that she'd been charged with a range of conduct, and that when they confronted her, they didn't sort it out. They didn't make her aware of the serious nature of some of the charges that they were trying to investigate. What Ms. ALDS was ultimately terminated for was, in large part, her own admission to the misconduct she'd engaged in with the subordinate employees, namely the kiss with Urias, who's a subordinate employee, that he characterized as unwanted, the rubbing of her hips against another employee, that is what, in large part, was the reason why she was ultimately terminated from Emerald. Similarly, when Mr. Ochoa admitted to making inappropriate comments, due to profanity in the workplace, he was similarly terminated from Emerald for violating its policies. It's also important to note that while Ms. ALDS alleged that this harassment commenced in November of 2009, she waited nearly a year to report that for the very first time to Emerald management. And that's despite the fact that she was fully aware of the reporting procedure, and she even admitted at deposition that she was fully aware that Leslie Myers, the director of HR, was available in the corporate office to report those allegations to, but she simply chose not to. And again, Ms. ALDS did not present any evidence to the trial court that Emerald management was actually or constructively aware of any alleged harassment towards Ms. ALDS by Ochoa, Urias, or Acosta. The quote I was looking for earlier is that in the reply brief, supposing counsel states Emerald's local personnel were well aware that the workplace was permeated with sexual matters, he implies in that statement that management was somehow aware, but the actual statements of fact that are cited do not evidence that any management was actually aware of this alleged harassment. In fact, ALDS never alleged at the trial court level that Emerald management was actually aware of any of the harassment prior to the September 2010 investigation. But the standard's not actual knowledge, though. It's constructive knowledge would be sufficient as well. Yes, and she is not alleged that they should have, that management should have known in the below moving papers either. As the district court noted, ALDS' contention that Emerald reached the wrong results somehow, which is what she was arguing at the trial court level, is really an opposite. As set forth in the court's decision, in this court's decision in Swenson v. Potter, an employer can act reasonably yet reach a mistaken conclusion as to whether or not the accused employee actually committed harassment. Counsel, you're actually over your time now, so I'm going to ask you to sum up. I apologize. Do you have a concluding remark or if you are prepared to submit? For all the foregoing reasons and as set forth in the briefing, I respectfully submit that the district court did properly grant complete summary judgment in Emerald's favor, and I respectfully request that this court affirm. Okay, thank you very much. Counsel, you have some time for rebuttal, so we'll hear what you have to say. The dependents are still making the mistake of saying that the Farragut-Eller defense, or however you say it, applies in this case. They're arguing, well, these weren't supervisory employees that were talking about Rusty Sanchez, and so therefore it's excusable. They're making the point that she didn't complain about this. As my brief pointed out, their policy says deal with it yourself and bring the serious stuff to us. So actually their sexual harassment policy says confront your harasser and bring the more serious things to us. She was following instructions. She was dealt a very bad hand here, and she played that as well as she could for a year. And they can't complain that when she does make written complaints to her supervisors, when she makes oral complaints to her supervisors and they're brushed off, that she should have been complaining more when she was doing that. And that kind of shoots the idea of the prompt investigation, if she had already complained verbally and in writing not only to her supervisors but to the correction officer supervisor as well. You know, the fact that 15 witnesses were interviewed cuts both ways. You know, how far will they go to avoid liability? How many witnesses will they get together in a conspiracy against her? And I'm not saying that that's all the supervisor doing that. Mr. Ochoa was a master manipulator. Did you make the argument below that they failed to interview among those 15, that they left out people that she identified as persons who might be knowledgeable? Well, she didn't have an opportunity to identify persons who would be knowledgeable because she didn't know that she was under investigation. So how could she supply counter witnesses? Counsel, did she know she was under investigation when they interviewed her? No. The questions that they asked her were, if I recall correctly, were, did you kiss the person? She had already made that complaint before and it had already been dismissed as not being an act of sexual harassment against her. And as far as rubbing up against somebody else, they're using as the fact that she was trapped and got up and rushed out past her harasser and everybody going, whoa, whoa, what's with Griselle here? She did know, didn't she, that she was under investigation. I thought your argument was that she knew, but what she thought she was under investigation for was not as serious as the things that she was actually terminated for. That's not correct? That's not correct. She didn't know that she was under investigation. She thought that these guys were doing follow-up investigation of her complaints, that she had made complaints about these witnesses, that they'd heard their stories, and that they came back to talk to her about the harassment that she had made. And in response to the thing about not being argued below and not being evidence, the things that I presented on appeal are all cited, too, in the record. There's nothing there that wasn't before the trial court. And one of the first things that they said is whether or not these things happened is disputed, and that's what trials are for. And this lady certainly has, you know, I look at it this way. The trial judge says, Mr. Smith, you've got a hard, hard case to go, to go and prove here, and I'm not going to waste my time and the jury's time with something that's probably going to end up in a defense verdict. That's not his words, but that's how I read his opinion. And she should have the chance to have her day in court. You have to be careful how you talk there, because I thought you were saying the judge had said that, you know. Yeah. I hope I'm clear. That is not a quote from the judge. But a jury could find a bad faith investigation here, lots of stuff to back it up. A jury could find a hostile work environment, but they're not going to have any. There's zero chance that they're going to find that unless the case gets presented to them at trial. Okay. Thank you, counsel. The case just argued will stand submitted. We appreciate the arguments from counsel on both sides. And we are in recess now until tomorrow.
judges: Oliver, Gould, Watford